Opinión disidente emitida por el
Juez Asociado Señor Rivera Pérez.
La opinión mayoritaria interpreta el alcance de la Ley Núm. 117,(1) a los efectos de que faculta al Gobierno cen *485 tral a cobrar 5.5% en concepto del IVU, a la vez que per-mite que los municipios cobren 1.5% en virtud del referido impuesto. Respetuosamente disentimos.
I
El 15 de noviembre de 2005 la delegación mayoritaria de la Cámara de Representantes de Puerto Rico (delegación mayoritaria), compuesta por legisladores electos por el Partido Nuevo Progresista (PNP), presentó el Proyecto de la Cámara 2193 de 15 de noviembre de 2005, 15ta Asamblea Legislativa, 2da Sesión Ordinaria (P. de la C. 2193), para establecer la Ley de Justicia Contributiva de 2006.(2) El propósito de la legislación era, entre otros, autorizar el cobro de un 7% por ciento en las ventas al detal, en concepto del Impuesto sobre Ventas y Uso (IVU). El P. de la C. 2193 fue referido a la Comisión de Hacienda y Asuntos Financieros de la Cámara de Representantes (Comisión de Hacienda) para que ésta realizara los correspondientes estudios, análisis y recomendaciones previo a su aprobación. Como parte de sus trabajos legislativos, la Comisión de Hacienda realizó, entre los meses de febrero a mayo de 2006, alrededor de treinta y cinco vistas públicas para evaluar los méritos del P. de la C. 2193.(3)
Luego de efectuadas las referidas vistas, el 20 de junio de 2006 la delegación mayoritaria en la Cámara de Representantes presentó un Proyecto Sustitutivo para dejar sin efecto diversas disposiciones contenidas en el P. de la C. 2193 (Proyecto Sustitutivo).(4) El Proyecto Sustitutivo dis *486 puso, en lo pertinente, para el cobro de un IVU total de 5.5%.
La Comisión de Hacienda presentó, conjuntamente con el Proyecto Sustitutivo, un extenso Informe Positivo, mediante el cual describía detalladamente el alcance, la intención, así como el propósito del Proyecto Sustitutivo al establecer un impuesto a las ventas al detal. (5) Por tal razón, en las páginas 40 y 41 del Informe Positivo, en lo pertinente, la Comisión de Hacienda puntualizó lo siguiente:
D —Aspectos Relevantes Concluyentes sobre Reforma Contributiva
Como resultado de los análisis efectuados sobre el Proyecto de Reforma Contributiva, en adición a los cambios técnicos del cambio de un sistema de arbitrios a uno de impuestos sobre las ventas al detal (IVD), presentaremos los puntos relevantes de esta pieza legislativa.

Sustituye el sistema de arbitrios por un impuesto general sobre venta al detal de 5.5% (4% para el Estado y 1.5% para los municipios).

E — Sobre el Impuesto a las Ventas
Luego de atendidos todos los escenarios sobre la determinación de bases del gasto de consumo (Ver tabla A y B Apéndice Económico), se fija el Impuesto de Venta al Detal de la siguiente manera:

El impuesto estatal será de 4%.

El impuesto municipal será de 1.5%. (Énfasis suplido.)
El Informe Positivo de la Comisión de Hacienda, así como el Proyecto Sustitutivo, fueron sometidos al pleno de la Cámara de Representantes para votación el 21 de junio de 2006. El Presidente de la Comisión de Hacienda, Hon. Antonio Silva Delgado, mediante el uso de recursos electrónicos y audiovisuales, realizó una extensa presentación del Proyecto Sustitutivo en el hemiciclo de la Cámara de *487 Representantes.(6) Durante ésta se presentó una proyección a la que se denominó “Recaudo Estimado-Total/ Distribución -Estado-Municipios”. En esta presentación se desglosó el recaudo estimado del IVU para el Estado y los municipios, utilizando como base el 5.5% por ciento, que claramente se subdividió en 4% por ciento para el Gobierno central y 1.5% por ciento para los municipios.(7)
Durante el debate en el hemiciclo de la Cámara, referente a la aprobación del Proyecto Sustitutivo, varios legisladores de la delegación mayoritaria hicieron referencia a un IVU total de 5.5%, a la vez que rechazaron la cifra 7%.(8)
Conviene repasar algunas de las expresiones de los miembros de la delegación mayoritaria del PNP durante el debate parlamentario, para auscultar la intención legislativa de la mayoría parlamentaria, al aprobar el porcentaje del IVU, contenido en el Proyecto Sustitutivo. Veamos.
El representante de la mayoría, Hon. Jorge Navarro Suárez, expresó lo siguiente:
Y aquí tenemos un por ciento de un sales tax de 5.5 por ciento, lo que ustedes no creían en la campaña electoral, hicieron campaña, jugaron politiquería para echar hacia atrás su posición .... (Enfasis suplido.) Diario de Sesiones, Sustitutivo al P. de la C. 2193, 21 de junio de 2006, 15ta Asamblea Legislativa, pág. 60.
La Hon. Albita Rivera Ramírez, miembro de la delegación mayoritaria, se expresó de la manera siguiente:
Así que, es importante, amigo contribuyente que sepas, que si no te han clavado con un siete por ciento en el sales tax, es por que aquí hay una legislatura del Partido Nuevo Progresista que ha velado porque no se sigan cargando a los contribuyentes .... (Enfasis suplido.) Diario de Sesiones, supra, pág. 87.
*488 Más adelante, en la discusión parlamentaria del Proyecto Sustitutivo, la Hon. Lourdes Ramos Rivera, legisladora electa por el PNP, se expresó en los términos siguientes: "... buscando como gravar el bolsillo del pueblo contribuyente con un sales tax de un siete por ciento que no se justifica ...” (Énfasis suplido.) Diario de Sesiones, supra, pág. 100.
De igual manera, la referida legisladora, expresó lo siguiente:
Estamos hablando ... también los compañeros de ... ahora sí, ahora el Proyecto 2193 como tenía el siete por ciento era el mejor del mundo, pero son ciegos o es que no quieren ver la realidad, había que escribir ahí un número para partir, pero desde el principio se habló de que lo que intentábamos era que fuera el menor por ciento posible, ¿y cómo le explico al pueblo que le estoy quitando el 6.6 para ponerle un 7? (Énfasis suplido.) Diario de Sesiones, supra, pág. 101.
El representante de la mayoría, Hon. Julio Román González, expresó las palabras siguientes:
Lo que ellos, como uno de los compañeros que nos retó para que se aprobara el 7 por ciento, y eso es el pedido del Gobernador, que le dio la notita para que lanzara ese reto a esta delegación. ¿Para qué? Para tener más dinero y seguir abusando del pueblo puertorriqueño con mayores imposiciones, como dijo otro que el siete era menor que el cuatro. Yo no he visto en ninguna matemática que un número mayor sea me-nor que uno ... un número menor. No sé dónde está la matemática, en qué colegio se la enseñaron, pero un cuatro es un cuatro y un siete es un siete.
Una reforma que ofrece alrededor de 500 millones de dólares en rebajas contributivas y en beneficios a la clase menesterosa de este país, y quieren el 7 ...y que saquen la cuenta de quiénes son los que van a pagar el siete. (Enfasis suplido.) Diario de Sesiones, supra, pág. 110.
El representante de la delegación mayoritaria, Hon. José Concepción Hernández, manifestó lo siguiente:
Los que no quieren ceder y siguen en el capricho del 7 por ciento del Señor Gobernador son nuestros amigos. Yo perso *489 nalmente estuve con el compañero Nelson del Valle, Sergio Ortiz y Pedrito, que fui y me reuní con el Gobernador buscando que bajara el 7 por ciento diciéndole la realidad de Puerto Rico y lo que vimos en la calle. Porque en la calle la misma iglesia que uno va es la misma iglesia que ustedes van. El mismo parque de pelota, las ligas infantiles y juveniles de pelota, de baloncesto, dondequiera ... en los programas de radio, la gente no quiere el 7por ciento. (Enfasis suplido.) Diario de Sesiones, supra, pág. 111.
En su tumo, el representante de la delegación mayoritaria, Hon. Luis Pérez Ortiz, expresó las palabras siguientes:
Aquí tiene la reforma señor Gobernador, y no solamente, señor Presidente, y me va a permitir hacerle estas expresiones. No es solamente hacerle llegar la reforma, que aprendan a creer, señor Presidente, en nosotros mismos. ¿Cuál es la prisa? ¿A qué le tienen ellos temor de no darle ese espacio de seis meses para aprobar el nivel de captación de ese 5.5 por ciento .... (Enfasis suplido.) Diario de Sesiones, supra, pág. 117.
El legislador del PNP, Hon. Ángel Pérez Otero, emitió las palabras siguientes:
Yo le invito a la delegación del Partido Popular y al pueblo de Puerto Rico, que hagan sus cómputos. No tan solo [sic] en las planillas, sino también con este impuesto al consumo de 5.5, que definitivamente, cuando finalicen esos cómputos van a percatarse y a darse cuenta, de lo que se está aprobando por la delegación del Partido Nuevo Progresista es favorable, es beneficioso para el Pueblo de Puerto Rico. (Enfasis suplido.) Diario de Sesiones, supra, pág. 125.
El 21 de junio de 2006, luego de un extenso debate parlamentario, el Proyecto Sustitutivo fue aprobado por la Cámara de Representantes con treinta y un votos a favor, y dieciocho en contra.(9)
Se desprende claramente del expediente legislativo, recogido en el Diario de Sesiones de la Cámara de Representantes de 21 de jimio de 2006, que los miembros de la de *490 legación mayoritaria del PNP emitieron su voto bajo la creencia y el convencimiento de que estaban aprobando un IVU total de 5.5%; que se habría de desglosar en 4% para el Gobierno central y 1.5% para los municipios.
Por el contrario, los representantes de la delegación minoritaria del Partido Popular Democrático (PPD) votaron contra la medida, ya que ésta disponía para la imposición de un IVU total de 5.5%, a la vez que rechazaba la imposición de un IVU de 7%. El Portavoz de la minoría del PPD, Hon. Héctor Ferrer Ríos, presentó una enmienda al Proyecto Sustitutivo para subir el IVU de un 5.5% a un 6.5%.(10) Se desprende del expediente legislativo que los representantes de la minoría del PPD se oponían al Proyecto Sustitutivo, ya que éste alteraba completamente el P. de la C. 2193, presentado originalmente el 15 de noviembre de 2005 por la delegación del PNP. Se oponían, en esencia, porque el Proyecto Sustitutivo cambiaba la tasa total del IVU de un 7%, contemplado en el P. de la C. 2193, a un 5.5%.(11) Quizás las expresiones más claras e ilustrativas *491 sobre las razones por las cuales la minoría del PPD votó contra el Proyecto Sustitutivo, surgen de las expresiones vertidas por el Hon. Sergio Ortiz Quiñones, legislador de la minoría del PPD, quien se expresó de la forma siguiente:
Y aquí también hay que recordar que hubo en un momento dado que estaban a favor de un 7 por ciento, y de la noche a la mañana, en un 4 o un 5.5, y siguieron bajando. (Enfasis suplido.) Diario de Sesiones, supra, pág. 73.
Se desprende también del historial legislativo del Proyecto Sustitutivo que en todo momento la minoría del PPD entendía que el IVU, contenido en el Proyecto Sustitutivo, proveía para el cobro de un impuesto total de 5.5%. Asimismo, los legisladores de la minoría del PPD expresaron su deseo de imponer un IVU de 7% para alegadamente darle alivios contributivos al pueblo.
El Proyecto Sustitutivo quedó aprobado con el lenguaje siguiente:
Sección 2401 — Impuesto sobre ventas
(a) Se impondrá, cobrará y pagará, a los tipos establecidos en esta sección, un impuesto sobre toda transacción de venta de una partida tributable en Puerto Rico. La aplicación del impuesto estará sujeta a las exenciones concedidas en el Capítulo 3 de este Subtítulo.
(b) La tasa contributiva será de un cinco punto cinco (5.5%) por ciento del precio de venta de la partida tributable y de transacciones combinadas.
Sección 2402 — Impuesto sobre Uso
(a) Se impondrá, cobrará y pagará, a los tipos establecidos en esta sección, un impuesto sobre uso, almacenaje o consumo de una partida tributable en Puerto Rico.
(b) La tasa contributiva será de un cinco punto cinco (5.5%) por ciento del precio de compra de la partida tributable.
*492 Sección 2410 — Limitación para Fijar Impuestos
Excepto según se dispone en la Sección 6189, ningún municipio, autónomo o no, del Estado Libre Asociado de Puerto Rico, podrá imponer o recaudar arbitrio o impuesto alguno sobre artículos, servicios, partidas tributables, o transacciones que estén sujetos o eximidos del impuesto sobre ventas y uso establecido en este Subtítulo, según establecido en la sección 6188 del Subtítulo F.
Sección 6188 — Limitación para Fijar Impuestos
Excepto según se dispone a continuación o en la Sección 6189, ningún municipio, autónomo o no, del Estado Libre Asociado de Puerto Rico, podrá imponer o recaudar ninguna contribución o impuesto establecido en este Código. ...
Sección 6189 — Imposición Municipal de Impuesto de Ventas y Uso al Detal
A. Se autoriza a los Municipios a imponer un impuesto sobre ventas y uso al detal de conformidad con la autorización establecida en la Sección 2410. Dicha contribución será por una tasa contributiva de un uno punto cinco (1.5%) por ciento, a ser impuesta de conformidad con la misma base, exenciones y limitaciones contenidas en el Subtítulo BB del Código .... (Enfasis suplido.) Sustitutivo al P. de la C. 2193 de 20 de junio de 2006,15ta Asamblea Legislativa, 3era Sesión Ordinaria, págs. 139-293.
Así las cosas, el 21 de junio de 2006 la Cámara de Representantes envió al Senado de Puerto Rico (Senado) el Proyecto Sustitutivo aprobado. Este fue referido a la Comisión de Hacienda del Senado (Comisión del Senado). El Presidente del Senado, Hon. Kenneth. McClintock Hernández (Presidente del Senado), relevó a la Comisión del Senado de los trámites legislativos referentes al Proyecto Sustitutivo. Por tal motivo, dicha comisión no produjo un informe con recomendaciones, debates o análisis en torno al referido proyecto.
El 25 de junio de 2006 el Presidente del Senado sometió a votación el Proyecto Sustitutivo en dicho cuerpo legislativo. Ese mismo día, esto es, el 25 de junio de 2006, el Senado aprobó, sin debate, enmiendas y sin informe de la Comisión del Senado, el Proyecto Sustitutivo con veinte y *493 tres votos a favor y dos en contra.(12) Los miembros del Senado votaron por el Proyecto Sustitutivo tal como lo había aprobado la Cámara de Representantes. En vista de que la Comisión del Senado no produjo un informe ni se llevó a cabo un debate legislativo, el historial donde se plasmó la intención legislativa, al aprobar el Proyecto Sustitutivo, es el debate vertido en el hemiciclo de la Cámara de Representantes.
El 27 de junio de 2006 el Gobernador de Puerto Rico, Hon. Aníbal Acevedo Vilá (Gobernador), manifestó que interpretaba que el Proyecto Sustitutivo establecía un IVU de 5.5% para el Gobierno central, a la vez que proveía para el cobro de un impuesto municipal de 1.5%. Asimismo, el Gobernador expresó que coincidía con la interpretación hecha por el Senado, a los efectos de que el Proyecto Sustitutivo aprobado proveía para el cobro de un IVU de 7%, desglosado en un 5.5% para el Gobierno central y 1.5% a nivel municipal.(13)
El 28 de junio de 2006, previo a que el Proyecto Sustitutivo se convirtiera en ley con la firma del Gobernador, la Cámara de Representantes aprobó dos resoluciones reafirmando su intención legislativa al aprobar el Proyecto Sustitutivo. Reiteraron que el P/U aprobado proveía para el cobro de un 5.5% total, desglosado en un 4% para el Gobierno central y un 1.5% para los municipios.(14)
El 4 de julio de 2006, el Gobernador firmó el Proyecto Sustitutivo, que se convirtió en la Ley Núm. 117.
El 13 de octubre de 2006, el Secretario de Hacienda, Hon. Juan Carlos Méndez (Secretario), promulgó el Regla *494 mentó Administrativo (Reglamento), que autoriza al Gobierno central a cobrar un 5.5% en concepto del IVU.(15)
Ante tal actuación, el 30 de octubre de 2006 los peticionarios presentaron una demanda en el Tribunal de Primera Instancia, Sala Superior de San Juan, contra el Gobernador y el Secretario. Alegaron que éstos hicieron una interpretación errónea y tergiversada del Proyecto Sustitutivo, que luego se convirtió en la Ley Núm. 117, mediante la cual pretenden imponer el cobro de un 5.5%, en concepto del IVU a nivel estatal. Alegan, entre otras cosas, que el Proyecto Sustitutivo, así como el expediente legislativo del debate de aquel proyecto, dejó claramente establecido que se aprobaba un IVU a nivel estatal de 4% y 1.5% a nivel municipal.(16) Ese mismo día presentaron ante este Tribunal un recurso de certificación para que atendiéramos la controversia trabada ante el foro primario.
Mediante Resolución de 31 de octubre de 2006, le concedimos a las partes un término de siete días para que se expresaran sobre los méritos de la acción presentada originalmente ante el Tribunal de Primera Instancia. Asimismo, ordenamos a que se expresaran sobre la legitimación activa de los peticionarios para instar el recurso de epígrafe.
El Procurador General compareció en representación del Gobernador y el Secretario. Alegó, entre otras cosas, que la Ley Núm. 117 no adolece de ambigüedad. Indicó que el texto de la referida ley es claro y que, ante esta situación, no se debe acudir a la intención legislativa, en conformidad con las reglas de hermenéutica, para interpretar el alcance del estatuto. Reseñó que la referida ley establece expresamente el cobro de una tasa porcentual de 5.5% para el Gobierno central, separada y distinta del 1.5%, en *495 concepto del IVU municipal. Puntualizó que la Ley Núm. 117 no debe ser interpretada a la luz del debate en el hemiciclo de la Cámara de Representantes, ya que las expresiones de “algunos legisladores” no pueden sustituir el texto de la ley, aprobada sin enmiendas por la Cámara y el Senado, y firmada por el Gobernador.
Alegó, además, que las See. 2401 y 2402, contenidas en la Ley Núm. 117, disponen para el cobro de un IVU de 5.5% por ser cobrado por el Estado Libre Asociado. Señaló que la tasa porcentual de las referidas secciones no incluyen la tasa porcentual de 1.5% municipal, provista por las See. 6188 y 6189, supra, de la referida ley. Indicó que los argumentos presentados por los peticionaros no logran crear dudas en torno a la letra de la ley, ya que el texto de ésta constituye la expresión por excelencia de la intención legislativa.
Argumenta, además, que la intención legislativa de un solo cuerpo legislativo no puede atribuírsele al otro, o al Gobernador, ya que el Senado aprobó la Ley Núm. 117 conforme al texto de ésta, mientras que el Gobernador firmó la referida ley exclusivamente a partir del texto contenido en el estatuto. Indicó que ni los senadores, ni el Gobernador tuvieron ante sí las expresiones del debate legislativo, efectuado en la Cámara de Representantes, referente a la aprobación de la Ley Núm. 117. Por otro lado, esgrimió que el Proyecto Sustitutivo no cambió radicalmente el P. de la C. 2193, sino que meramente separó, con mayor claridad, las tasas porcentuales del TVU entre el Gobierno central y los municipios. Finalmente, señaló que interpretar la referida legislación a los efectos de que impone un IVU total de 5.5% traería consecuencias nefastas para la economía del país, ya que las proyecciones económicas gubernamentales se han efectuado a base de un IVU total de 7%.(17)
Por su parte, los peticionarios de epígrafe alegaron que el reglamento aprobado por el Secretario es nulo, ya que *496 provee para el cobro de un IVU de 5.5% a nivel estatal, desvirtuando el mandato legislativo, que provee para el co-bro de un 4%. Alegaron, en síntesis, que el texto de la Ley Núm. 117 provoca confusión y dudas sobre su alcance y aplicación. Intimaron que la interpretación de una ley en forma contraria a la intención del legislador constituye una usurpación de las prerrogativas de la rama legislativa. Argüyeron que la referida ley no faculta a los municipios a cobrar un IVU separado y distinto al 5.5% por ciento del Gobierno central. Indicaron que durante todo el trámite legislativo, esto es, durante las vistas públicas realizadas por la Comisión de Hacienda, el Informe Positivo preparado por ésta, el debate en el hemiciclo de la Cámara de Representantes, se discutió la aprobación de un IVU total de 5.5%. Sostuvieron que ante este escenario se debe acudir a la intención legislativa para auscultar la voluntad del legislador al aprobar una ley. Puntualizaron que del debate realizado en la Cámara de Representantes se desprende la intención indubitada de la delegación mayoritaria de aprobar un IVU total de 5.5%.
Por otra parte, señalaron que, en casos de dudas, los estatutos que imponen contribuciones deben interpretarse de manera restrictiva contra el Gobierno y a favor del contribuyente. Precisaron que, cuando el propósito de imponer una contribución no es claro, la duda se resuelve a favor de la no imposición de aquélla. Argüyeron, además, que después de un extenso estudio del P. de la C. 2193, supra, que proveía para el cobro de un IVU total de 7%, la Comisión de Hacienda precisó la necesidad de hacerle innumerables enmiendas. En consecuencia, indicaron, se presentó el Proyecto Sustitutivo cambiando la tasa autorizada del IVU de 7% a un 5.5% total. Finalmente, esbozaron que, debido a que el Senado aprobó el Proyecto Sustitutivo sin debate legislativo, informes o enmiendas, éste quedó *497 aprobado tal como lo había aprobado la Cámara de Representantes, esto es con un IVU total de 5.5%.(18)
La Cámara de Representantes presentó su posición en torno al porcentaje aprobado en concepto del IVU, contenido en la Ley Núm. 117.(19) En su alegato, indicaron, entre otras cosas, que el Proyecto Sustitutivo disponía para el cobro de un IVU total de 5.5%. Asimismo, precisaron que el texto de la Ley Núm. 117 es susceptible de diversas interpretaciones. No obstante, argüyeron que en ausencia de un lenguaje claro en el texto de la ley, se debe recurrir a la intención legislativa y al historial del Proyecto Sustitutivo para conocer el verdadero propósito del legislador. Reiteraron que cuando surgen dudas sobre el alcance de una ley que impone contribuciones, la interpretación debe favorecer al ciudadano. Intimaron que el Gobernador y el Secretario se extralimitaron en sus facultades al interpretar, acomodaticiamente, el alcance del Proyecto Sustitutivo. Puntualizaron que, ya que el Senado aprobó el referido proyecto sin debates, informes o enmiendas, la intención legislativa de la Cámara de Representantes quedó inalterada. Alegaron, además, que con sus actuaciones, el Gobernador y el Secretario han usurpado las prerrogativas de la Rama Legislativa. Solicitan que se declare nulo el reglamento promulgado por el Secretario, en virtud del cual se faculta al Gobierno central al cobro de un 5.5% en concepto del IVU. Sostienen que el Proyecto Sustitutivo, que luego se convirtió en la Ley Núm. 117, provee, conforme a la intención legislativa, para el cobro de un 4% de IVU para el Gobierno central.(20) Finalmente, expresaron *498 que, en conformidad con la Constitución del Estado Libre Asociado Puerto Rico, es la Cámara de Representantes el cuerpo legislativo donde se originan las medidas para obtener rentas e imponer contribuciones.(21) En consecuencia, intimaron, la intención legislativa de ese cuerpo es determinante al momento de interpretar estatutos que imponen contribuciones.
Por otro lado, el 6 de noviembre de 2006 el Banco Gubernamental de Fomento (BGF) presentó una Solicitud de Autorización para comparecer como amicus curiae. El BGF presentó una diversidad de argumentos por los cuales entendía se debía interpretar la Ley Núm. 117 a los efectos de que autoriza el cobro de un IVU total de 7%. Fundamentó sus alegaciones en el hecho de que las proyecciones económicas, presentadas por el Gobierno a distintos inversionistas, así como a las agencias acreditadoras calificadoras del crédito del Gobierno de Puerto Rico, se basan en la entrada en vigor de un IVU total de 7%. Intima que, de interpretarse que la referida legislación provee para el co-bro de un IVU total de 5.5%, se lastimaría severamente la economía del país. Arguye que tal determinación podría tener repercusiones nefastas en las finanzas del país, así como en la emisión de deuda pública, mediante bonos, del Gobierno de Puerto Rico.(22)
A la luz del Proyecto Sustitutivo, el Informe Positivo de la Comisión de Hacienda de la Cámara de Representantes, la presentación audiovisual que hiciera el Presidente de la Comisión de Hacienda, Hon. Antonio Silva Delgado, a to-dos los legisladores, las expresiones de éstos durante el debate del Proyecto Sustitutivo, así como la votación final aprobando la pieza legislativa, concluimos que el lenguaje aprobado en el estatuto, que dispone para el cobro de un *499 IVU total 7%, constituye un error de redacción en el texto de la ley.
II
Coincidimos con lo expresado por la mayoría en cuanto a la legitimación activa de los peticionarios, así como con las expresiones referentes a la madurez del recurso ante nuestra consideración.
A. Aplicación de las reglas de hermenéutica en la interpretación de estatutos
Dentro de nuestra forma republicana de gobierno, tenemos el deber de interpretar las leyes y despejar las lagunas que puedan existir en éstas utilizando como guía la intención del legislador.(23) Por tal motivo hemos manifestado que es norma firme de hermenéutica que la letra clara de una ley es la mejor expresión de su espíritu.(24)
El Art. 14 del Código Civil de Puerto Rico dispone lo siguiente: “Cuando la ley es clara [y] libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu.”(25) Del lenguaje de este estatuto se colige que la ley está sujeta a ser interpretada, limitando tal interpretación, en algunos casos, a lo que surja de su texto claro. No obstante, el Art. 19 del Código Civil de Puerto Rico reconoce que el espíritu de la ley, reflejado en la intención legislativa, es la mejor herramienta para encontrar el verdadero sentido de una ley.(26) El espíritu de la ley juega un papel fundamental en la interpretación de un estatuto. La intención del legislador al aprobar una ley es tan importante que hemos establecido que si *500 la letra de una ley está en contraposición a su espíritu, claramente establecido en el historial legislativo, prevalecerá el espíritu de la ley.(27)
Hemos resuelto que la función de los tribunales es interpretar la ley y no juzgar la sabiduría del legislador al aprobarla.(28) Al interpretar un estatuto, la intención legislativa debe ser buscada en el lenguaje usado en él, con la ayuda que permiten las reglas de hermenéutica legal. Al descargar nuestra función de interpretar una disposición particular de un estatuto debemos siempre considerar cuáles fueron los propósitos perseguidos por la Asamblea Legislativa al aprobarlo, de manera que nuestra interpretación asegure la efectividad de la intención que lo anima.(29) Hemos expresado anteriormente que la literalidad de una ley puede ser ignorada por los tribunales cuando ella es claramente contraria a la verdadera intención o propósito legislativo.(30) El tribunal debe rechazar una interpretación literal y forzada de un texto legal que conduzca a un resultado que no puede haber sido el que intentó el legislador. La letra de la ley no puede ser seguida ciegamente en casos que no caen dentro de su espíritu.(31)
Los tribunales debemos siempre considerar cuáles fueron los propósitos perseguidos por la Asamblea Legislativa al aprobar una legislación, de manera que su interpretación asegure la efectividad de la intención legislativa.(32) Por tal razón, si los tribunales interpretan la ley en forma *501 contraria a la evidente intención del legislador, se estarían usurpando las prerrogativas de la Rama Legislativa.(33)
B. Prerrogativas de la Rama Legislativa
En la esfera administrativa, la ley es la fuente legal o el medio que le confiere el poder a una agencia administrativa para velar por el cumplimiento de su ley habilitadora.(34) La ley habilitadora es el mecanismo legal que autoriza y delega a la agencia administrativa los poderes para que actúe conforme al propósito perseguido en dicha ley. (35) En nuestra función revisora de reglamentos administrativos no podemos perder de perspectiva que un reglamento promulgado para implementar la ejecución de una ley puede complementarla, pero no estar en conflicto con ésta.(36) Si el reglamento está en conflicto con la ley habilitadora que permite y promueve su creación, la disposición reglamentaria tiene que ceder ante el mandato legislativo.(37) Por tal motivo, hemos manifestado que un reglamento es nulo si claramente está en conflicto o en contra de la ley.(38) Bajo la doctrina de delegación de poderes, el organismo administrativo goza de las funciones que se le han encomendado legislativamente. (39) En ausencia de un mandato legislativo expreso o implícito, aquella actuación administrativa que no obedezca el poder conferido es una actuación ultra vires de la agencia administrativa.(40) Una agencia administrativa no puede asumir jurisdicción sobre *502 situación alguna que no esté autorizada por ley; es decir, ni la necesidad, ni la utilidad, ni la conveniencia, pueden sustituir al estatuto en cuanto a fuente de poder de una agencia administrativa. Es por ello que cualquier duda en cuanto a la existencia de dicho poder debe resolverse en contra de su ejercicio.(41)
Cuando el texto de una ley es incompatible y está en conflicto con la clara y manifiesta intención legislativa, plasmada en un extenso historial legislativo, prevalecerá tal intención. El debate vertido en el hemiciclo de la Cámara de Representantes, durante la aprobación del Proyecto Sustitutivo, dejó establecida la clara y manifiesta intención legislativa de aprobar un IVU total de 5.5%.
Los miembros de la delegación mayoritaria rechazaron en todo momento la aplicación de un IVU total de 7%. De igual manera, el Informe presentado conjuntamente con el Proyecto Sustitutivo, así como la presentación realizada por el Presidente de la Comisión de Hacienda, Hon. Antonio Silva Delgado, establecieron claramente que se estaba considerando un IVU total de 5.5%, desglosado en un 4% para el Gobierno central y un 1.5% para los municipios. Por otra parte, se desprende del expediente legislativo que la minoría del PPD intentó, sin éxito, subir el IVU total de un 5.5% a un 6.5%. Asimismo, las expresiones de los legisladores de minoría dejaron claramente establecido que el Proyecto Sustitutivo había alterado, en su totalidad, el P. de la C. 2193, presentado en noviembre de 2005, que proveía para el cobro de un IVU total de 7%. Finalmente, la delegación minoritaria reconoció que el Proyecto Sustitutivo bajaba el IVU total de un 7% a un 5.5%.(42)
En vista de lo anterior, resulta forzosa la conclusión de que el texto de la ley, según quedó redactado, en cuanto *503 dispone sobre un IVU total de 7%, es un error de redacción.(43)
El reglamento promulgado por el Secretario de Hacienda dispone para el cobro de un IVU a nivel estatal de 5.5%. Tal reglamento es contrario a derecho. La Asamblea Legislativa aprobó el cobro de un IVU total de 5.5%, donde solamente se faculta al gobierno central al cobro de un 4%.
Legitimar el Reglamento aprobado por el Secretario lesionaría los principios más fundamentales de nuestro sistema republicano de gobierno. Validar tal actuación no sólo infringe las prerrogativas de la Legislatura, sino que violenta la separación de poderes de nuestro ordenamiento constitucional.

Concluimos que el Reglamento aprobado por el Secretario es nulo por ser contrario al poder que le delegó la Asamblea Legislativa, en virtud de la Ley Núm. 117.

C. Interpretación de estatutos contributivos
Recientemente tuvimos la oportunidad de atender una controversia que trataba, en esencia, sobre la interpretación de estatutos contributivos.(44) En aquella ocasión ex-presamos lo siguiente:
En la interpretación de estatutos que imponen contribuciones, es la práctica establecida no extender sus disposiciones, por implicación, más allá del claro alcance del lenguaje usado, o ampliar su radio de manera que comprenda materias que no han sido específicamente señaladas. En caso de duda, se interpretan estrictamente en contra del Gobierno y a favor del ciudadano. (Énfasis suplido.(45)
*504 De igual manera, determinamos que es un principio cardinal que la legislación contributiva no se interpreta en forma extensiva, sino que debe interpretarse en forma justa y de acuerdo con sus propios y expresos términos.(46) En BBC Realty v. Secretario Hacienda, supra, concluimos, guiados por las reglas de hermenéutica, que cuando una ley que impone contribuciones, impuestos o arbitrios no advierta sobre la intención del legislador, ésta se debe interpretar restrictivamente en contra del Estado y a favor del ciudadano. Puntualizamos que la interpretación restrictiva de estatutos contributivos se limita únicamente a aquellas instancias en las que el Estado pretende imponerle al ciudadano el cobro de una contribución, impuesto o arbitrio.(47) Reafirmamos que los estatutos que imponen contribuciones deben interpretarse de una forma justa, para así cumplir con sus propios y expresos términos. Obrar de otra manera violentaría principios básicos, de raíces firmes en nuestra jurisprudencia y en nuestro ordenamiento jurídico. Cuando el propósito de imponer una contribución no es claro, la duda debe resolverse a favor de la no imposición de aquélla.(48)
Concluimos que el texto de la Ley Núm. 117 es incompatible y está en conflicto con la clara y manifiesta intención legislativa de aprobar un TVU total de 5.5%. Ante tal situación, no podemos avalar que se interprete tal legislación en peijuicio del ciudadano y a favor del Gobierno. El cobro de un XVU de 5.5% para el Gobierno central, sumado al 1.5% a nivel municipal, para un total de 7%, es claramente más perjudicial para el ciudadano que el cobro de un TVU total de 5.5%.
De acuerdo con el mandato legislativo, resulta proce *505 dente el cobro de un IVU total de 5.5%, del cual 4% corresponde al Gobierno central y 1.5% a los municipios.
III
La decisión de la Mayoría desvirtúa la clara y manifiesta intención legislativa de la Cámara de Representantes que, a su vez, es el cuerpo obligado por el Art. Ill, Sec. 17 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, a originar medidas de recaudo. Ignora el historial legislativo que existe en torno a la Ley Núm. 117, ya que el Senado aprobó dicha legislación sin debates, enmiendas o informes de comisión, o sea, tal como quedó aprobada por la Cámara de Representantes. Le imprime un peso desproporcionado al texto de la ley que hace referencia a un IVU total de 7% cuando del expediente legislativo surge claramente que tal porcentaje es un error de redacción. No podemos avalar tal curso de acción.
El profundo respeto que nos merece la intención del legislador nos obliga en determinadas ocasiones a suplir las inadvertencias en que éste pueda haber incurrido. Para evitar un resultado irrazonable e insostenible, en el pasado no hemos vacilado en aclarar el texto de una ley conforme a la intención legislativa. Es regla dorada de hermenéutica judicial que las disposiciones de una ley deben ser examinadas e interpretadas de modo que no conduzcan a resultados irrazonables e insostenibles, sino armoniosos.(49)
IV
Por los fundamentos antes expuestos, disiento del criterio de la Mayoría.

 Ley Núm. 117 de 4 de julio de 2006.

 Proyecto de la Cámara de Representantes 2193, Apéndice, págs. 170-246.

 Presentación P. de la C. 2193, Apéndice, págs. 607-610. Depusieron los siguientes: Departamento de Hacienda, Banco Gubernamental de Fomento, Departamento de Desarrollo Económico y Comercio, Colegio de Contadores Públicos Autorizados, Asociación de Bancos de Puerto Rico, Departamento de Asuntos al Consumidor, Asociación de Industriales, Asociación de Economistas de Puerto Rico, Oficina del Comisionado de Instituciones Financieras, Cámara de Comercio de Puerto Rico, Colegio de Abogados de Puerto Rico.

 Sustitutivo al P. de la C. 2193, Apéndice, págs. 454-603.

 Informe Positivo sobre el Sustitutivo del P. de la C. 2193, Apéndice, págs. 245-454.

 Presentación P. de la C. 2193, Ley de Reforma Contributiva 2006, Apéndice, págs. 604-643.

 íd., pág. 614. Véase pág. 11 de la presentación.

 Diario de Sesiones, Sustitutivo al P. de la C. 2193, 21 de junio de 2006, 15ta Asamblea Legislativa, págs. 60, 87, 100, 101, 110, 111, 117, 125, Apéndice, págs. 644-791.

 Apéndice, pág. 718.

 ei Portavoz de la minoría del Partido Popular Democrático (PPD), Hon. Héctor Ferrer Ríos, se expresó de la manera siguiente: “Segunda enmienda, en el Capítulo 2, sección 2401, en el subinciso [sic] (b), sustituir ‘5.5 por ciento’ por ‘6.5’.” Diario de Sesiones, supra, pág. 103. Asimismo, más tarde en el debate, el Portavoz de la minoría del PPD sugirió subir la tasa del IVU de un 5.5% a un 6.5%. Por tal motivo, expresó las palabras siguientes:
“Señor Presidente, esta enmienda propuesta lo que hace es que atempera prácticamente, y soluciona el déficit presupuestario o estructural que tiene el gobierno de Puerto Rico, en un período básico de algunos tres años. Si antes de ese término se cobra el dinero suficiente y se paga, automáticamente se elimina ese uno por ciento del impuesto a la venta y se baja al 5.5. Hacemos todo lo contrario de lo que ustedes quieren hacer. Un 5.5 para subir a un 6.5 ...” (Énfasis suplido.) íd., pág. 113.

 El Hon. Ferdinand Pérez Román, miembro de la minoría del PPD, se ex-presó de la manera siguiente:
“Hoy, pues quizás las presiones políticas y los escenarios que se viven en la Cámara de Representantes, pues, han provocado unos cambios en las posturas después de tantos meses de trabajo. Pero la realidad es que desde que se radicó el Proyecto el 15 de noviembre, por la Mayoría del PNP, que tenía como base un 7 por ciento ... eso no lo inventó nadie. No se lo inventó el Partido Popular, fue el Proyecto que ustedes radicaron. Después que se empezó a elaborar y a discutir ese Proyecto, el 2193, el 16 de enero, el Ejecutivo presentó su Proyecto de enmiendas .... La verdad es, que después de tantos meses de trabajo analizando los dos Proyectos, cogieron los dos Proyectos, los echaron a la borda y sacaron un nuevo Proyecto. Después de meses y meses de ponencias, de semanas de trabajo, de esfuerzo de horas allí, hoy estamos discutiendo otra cosa totalmente distinta a lo que los deponentes presentaron. Es *491 más, básicamente tendríamos que hacer vistas nuevamente del Proyecto que radican hoy porque no tiene nada de lo que radicaron el 15 de noviembre, que era el 2193. Es un Proyecto totalmente distinto.” (Énfasis suplido.) Diario de Sesiones, supra, pág. 57.

 Demanda presentada por los peticionarios ante el Tribunal de Primera Instancia el 30 de octubre de 2006, Apéndice, pág. 9.

 “Fortaleza coincide con interpretación en el Senado”, Primera Hora, 27 de junio de 2006, pág. 9, Apéndice, pág. 959; “Reforma Firmada”, El Vocero de Puerto Rico, 5 de julio de 2006, pág. 6, Apéndice, pág. 1130.

 R. de la C. 5269 y R. Cone, de la C. 81, Apéndice, págs. 960-963.

 Reglamento del Departamento de Hacienda para implantar las disposiciones del Subtítulo BB —Impuesto sobre Ventas y Uso—, Apéndice, págs. 38-170.

 Demanda presentada por los peticionarios ante el Tribunal de Primera Instancia el 30 de octubre de 2006. Apéndice, pág. 9.

 Alegato de las partes recurridas, págs. 11-45.

 Escrito Exponiendo la Posición de los Peticionarios, págs. 18-34, presentada ante nos el 7 de noviembre de 2006.

 El 1 de noviembre de 2006 la Cámara de Representantes presentó una Solicitud de Intervención y/o Comparecencia como Amicus Curiae. El 2 de noviembre de 2006 le concedimos a la Cámara de Representantes y al Senado un término de siete días para que expresaran su posición por escrito.

 íd.

 Véase Art. Ill, Sec. 17, Const. E.L.A., L.P.R.A., Tomo 1.

 Memorando de Comparecencia Especial del Banco Gubernamental de Fomento para Puerto Rico, págs. 1-25.

 Alejandro Rivera v. E.L.A., 140 D.P.R. 538, 545 (1996).

 Santiago v. Supte. Policía de P.R., 151 D.P.R. 511 (2000); Alejandro Rivera v. E.L.A., supra; Meléndez v. Tribunal Superior, 90 D.P.R. 656 (1964).

 31 L.P.R.A. sec. 14.

 31 L.P.R.A. sec. 19.

 Sucn. Álvarez v. Srio. de Justicia, 150 D.P.R. 252 (2000); Pueblo v. Zayas Rodríguez, 147 D.P.R. 530 (1999); Figueroa v. Díaz, 75 D.P.R. 163 (1953).

 Alonso García v. S.L.G., 155 D.P.R. 91 (2001); Famania v. Corp. Azucarera de P.R., 113 D.P.R. 654 (1982).

 Irizarry v. J & J Cons. Prods. Co., Inc., 150 D.P.R. 155 (2000); Dorante v. Wrangler of P.R., 145 D.P.R. 408 (1998); Vázquez v. A.R.Pe., 128 D.P.R. 513 (1991).

 Otero de Ramos v. Srio. de Hacienda, 156 D.P.R. 876 (2002); Pueblo v. Zayas Rodríguez, supra.

 íd.

 J.P. v. Frente Unido I, 165 D.P.R. 445 (2005).

 íd.; Alejandro Rivera v. E.L.A., supra.

 J.P. v. Frente Unido I, supra; Caribe Comms., Inc. v. P.R.T.Co., 157 D.P.R. 203 (2002).

 íd.

 íd.; Pérez v. Com. Rel. Trab. Serv. Pub., 158 D.P.R. 180 (2002); Asoc. Fcias. Com. v. Depto. de Salud, 156 D.P.R. 105 (2002); P.S.P. v. Com. Estatal de Elecciones, 110 D.P.R. 400, 409 (1980).

 J.P. v. Frente Unido I, supra.

 íd.; P.S.P. v. Com. Estatal de Elecciones, supra.

 Caribe Comms., Inc. v. P.R.T.Co., supra.

 Acevedo v. Mun. de Aguadillo, 153 D.P.R. 788 (2001); Misión Ind. P.R. v. J.P., 146 D.P.R. 64 (1998).

 Raimundi v. Productora, 162 D.P.R. 215 (2004).

 Véanse las págs. 487-492 de esta opinión.

 En Pueblo v. Álvarez Rodríguez, 154 D.P.R. 566 (2001), expresamos lo siguiente: “Solamente haremos interpretaciones que divergen del texto claro de la ley, como la que hicimos en Pueblo v. Zayas Rodríguez, supra, en los casos extraordinarios en los cuales resulte forzoso concluir del historial legislativo que la Legislatura ha cometido un error accidental de redacción.” (Énfasis suplido.)

 B.B.C. Realty v. Secretario Hacienda, 166 D.P.R. 498 (2005).

 El más alto foro federal determinó que, ante la duda sobre la procedencia de una contribución, ésta debe resolverse a favor del ciudadano. Véase Gould v. Gould, 245 U.S. 151 (1917).

 BBC Realty v. Secretario Hacienda, supra; Talcott Inter-Amer. Corp. v. Registrador, 104 D.P.R. 254 (1975).

 Central Coloso v. Descartes, Tes., 74 D.P.R. 481, 486 (1953); Plácido Longo & Cía. v. Sancho Bonet, Tes., 50 D.P.R. 160 (1936).

 B.B.C. Realty v. Secretario Hacienda, supra.

 Pueblo v. Zayas Rodríguez, supra.